```
             UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                      **Civil Action No. 2:14-25143**

**E.I. Du PONT de NEMOURS**
**AND COMPANY**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

**Pending are the United States' unopposed motions (1) to enter the proposed consent decree, filed October 17, 2014, and (2) to substitute the proposed consent decree, filed November 12, 2014.**

**In seeking to substitute the proposed consent decree with a revised copy submitted November 12, 2014, the United States seeks merely to correct a single typographical error.  In paragraph 64 on page 26, there is an incorrect reference to an "SLM Unit"; "SLM" should instead be "SAR" Unit.  The error was noticed by DuPont's counsel, who has not appeared herein, but who "contacted the United States' counsel and identified . . . [the] typographical error . . . ."  (Mot. at 1).  It is ORDERED that the motion to substitute the proposed consent decree be, and hereby is, granted.**

I.

A.   The Underlying Conduct

E.I. DuPont de Nemours and Company ("DuPont") operates a chemical production facility in Belle, West Virginia ("Belle Facility").  The Belle Facility is located on a plot of approximately 700 acres of land along the Kanahwa River.  It is roughly eight miles east of Charleston.  Approximately 50 individuals live within 0.2 miles of the Belle Facility, which is located in an area that consists of industrial, commercial, and residential land use.  The Belle Facility produces, processes, handles, stores, and disposes of "hazardous substances and extremely hazardous substances" within the meaning of Section 112(r)(1) and (3) of the Clean Air Act ("Act").  (Compl. ¶ 42).

During all relevant times, the Belle Facility had eight regulated processes under title 40 of the Code of Federal Regulations, which deals with environmental protection.  For these processes, DuPont was required to submit a risk management plan ("RMP") to certain federal regulators.  Two of the regulated processes at the Belle Facility were the Sulfuric Acid

Recovery unit ("SAR Unit") and the Phosgene operations ("Phosgenation Process") at the Small Lots Manufacturing unit ("SLM Unit").  The SAR Unit and the Phosgenation Process at the SLM Unit ceased operations in 2010 and 2011, respectively.

This action centers primarily on three releases of toxic substances.  First, on January 17, 2010, a production unit at the Belle Facility was restarted after extended maintenance.  Methyl chloride was one substance produced in a reaction vessel in the unit.  The substance was accidentally released when it flowed through a blown ruptured disc.  It also escaped from the weep hole in a vent line which allowed toxic gases to accumulate into an unsafe location in the building where the process was housed.  The release triggered an alarm designed to notify Belle Facility operators of an over pressurization.  The alarm was activated in the Belle Facility's control room.  The methyl chloride release and alarm, however, continued for five days from and after January 17, 2010, before the defendant adequately responded to it.  The defendant was aware of the release by 5:00 a.m. on January 22, 2010.  It did not notify the West Virginia Department of Environmental Protection Spill Hotline until 2:15 p.m.  Approximately 2,045 pounds of methyl chloride escaped.  The unit continues to operate.

Second, in the early morning hours on January 23, 2010, a release of oleum, a concentrated form of sulfuric acid produced by the SAR unit, occurred.  According to the United States' complaint, "Oleum is an extremely corrosive substance that causes severe eye and skin burns and is deadly if inhaled.  It is reactive with metals and may react to form explosive hydrogen gas."  (Compl. ¶ 64).  Over the passage of time, the oleum corroded piping in the SAR Unit and created a hole.  The substance then escaped through the hole.  Workers discovered the resulting vapor cloud shortly after 7:00 a.m. on January 23, 2010.  Approximately 22 pounds of oleum was released into the environment.  The SAR unit process is said not to have been restarted after this event.

An oleum leak had previously occurred at the Belle Facility on January 27, 2009.  That incident resulted in a company recommendation to conduct regular maintenance piping inspections.  The recommendation was not carried out for the line that leaked.  DuPont has no records of performing visual external inspections or thickness testing of that piping.

Third, on January 23, 2010, phosgene was released.  Phosgene is one of the raw materials used in the SLM Unit to produce five isocyanate intermediate products for

4

pesticides. The phosgene was received and stored in 2000 pound cylinders. The United States' complaint alleges as follows:

> Phosgene is an industrial toxin once used as a chemical weapon in World War I. Phosgene is a severe pulmonary irritant and exposure [that] causes a buildup of fluid in the lungs that may not materialize until hours after exposure. Phosgene is highly toxic because it contains a lethal concentration equal to or less than 200 parts per million ("ppm") in air when administered via inhalation for one hour. A lethal concentration of phosgene is five ppm for one hour of exposure. Exposure to 20 ppm for five minutes may be fatal.

(Compl. ¶ 75).

The subject release involved at least two pounds of phosgene. The cause of the release was the failure of a braided stainless steel transfer hose in the SLM Unit. The transfer hose was connected to a one-ton cylinder of phosgene. The phosgene cylinders were stored in a single story, partially walled structure called the phosgene shed, which was open to the atmosphere. Inside each hose was a liner made of Teflon.

During use, the Phosgene cylinders were connected to other equipment with the transfer hoses. As one cylinder empties, an alarm sounds and the operator closes the valves to the empty cylinder and opens the valves to a second full cylinder. The transfer hoses connected to the empty cylinder are then purged of the Phosgene with nitrogen.

On the day prior to the phosgene release, operators were experiencing flow problems with one of the cylinders. They began switching between the cylinders to avoid disruption to the chemical process. During the course of switching cylinders, the valves were closed on a partially full cylinder. Unfortunately, the transfer hose was not purged. This allowed pressure to build as the liquid phosgene was undergoing thermal expansion due to ambient air temperature increase.

Consequently, sometime between 1:45 p.m. and 2:00 p.m. on January 23, 2010, a worker was inspecting one of the cylinders when the pressurized transfer hose suddenly burst. The worker was sprayed across the chest and face with a lethal dose of phosgene. Another worker was exposed to the phosgene gas and a third was potentially exposed. The worker receiving the fatal dose was transported to a local hospital. His condition progressively deteriorated and he perished the next day.

The phosgene release occurred approximately 6 hours after the oleum release. It happened approximately 21 hours after DuPont contends that it learned of the methyl chloride release. DuPont's standard operating procedure ("SOP") required replacement of phosgene hoses every two months. The failed transfer hose had not been replaced for over 7 months.

A recommendation from experts employed by DuPont, dating to 1987, urged the use of Monel, a strong metal alloy lined hose, for phosgene service. That recommendation appears to have been ignored. DuPont had other opportunities to prevent an accidental phosgene release. For example, in 2004, it developed a plan to fully enclose the phosgene shed and equip it with a scrubber by 2005. This plan also was apparently ignored. In 2011, DuPont shut down the phosgene operation at the Belle Facility.

Between January 25, 2010, and September 2011, the Occupational Safety and Health Administration ("OSHA"), the United States Chemical Safety Board ("CSB") and the Environmental Protection Agency ("EPA") investigated the circumstances that led to the methyl chloride, oleum and phosgene releases. The CSB found that the releases were preventable incidents caused by deficiencies in plant safety management systems relating to maintenance and inspections, alarm recognition and management, accident investigation, emergency response and communications, and hazard recognition. DuPont paid a $43,000 administrative penalty to resolve the OSHA citations it received. EPA also directed DuPont to address certain violations, which it accomplished in December 2011.

7

In addition to the aforementioned incidents, the complaint alleges other misconduct by DuPont at the Belle Facility. At 3:20 a.m., on May 4, 2006, a disc ruptured in the ethyl carbamoyl phosphate process in building 114 at the Belle Facility. Over a period of two to three days, approximately 8,100 pounds of ethyl chloride ("ECl"), a listed hazardous substance with a 100 pound reportable quantity, were vented to the atmosphere. The release migrated off-site. DuPont did not discover the release until over two days later, on May 6, 2006, at 8:00 a.m. Despite that knowledge, it failed to notify the National Response Center ("NRC") of the release until 12:21 p.m. on May 6, 2006.

Second, on December 9, 2006, there were three releases of trimethylamine at 4:30 p.m., 5:45 p.m. and 7:20 p.m., from the methylamine unit at the Belle Facility. Trimethylamine is a listed hazardous substance with a reportable quantity of 100 pounds. Citizens in Charleston complained of odors between 6:00 p.m. and 9:00 p.m. on December 9, 2009. DuPont, however, failed to notify the NRC of the release until December 10, 2006 at 1:56 p.m. The releases totaled 604 pounds.

Third, at an unknown hour on December 22, 2008, the phosphoric acid bulk storage tank located at the water treatment

plant at the Belle Facility was being loaded from a transport trailer with a delivery of 4,249 gallons of 35% phosphoric acid. Phosphoric acid is a listed hazardous substance with a reportable quantity of 5,000 pounds. At 1:46 p.m., a DuPont employee noticed that a phosphoric acid release was occurring and the employee notified Belle Facility personnel. The leak was contained by 2:15 p.m. but not before it migrated offsite. DuPont did not notify the NRC until 5:05 p.m. The release resulted in 5,412 pounds of phosphoric acid escaping.

Fourth, from September 3 through September 17, 2010, there were approximately 10 alarms triggered in the total organic compound ("TOC") analyzer at the Belle Facility. Those alarms indicate organic compounds in the water stream discharging from the Belle Facility into the Kanawha River. At approximately 2:30 p.m. on September 21, 2010, DuPont took samples at the outfall to the Kanawha River. The results showed the total organic compounds level to be 55 ppm. Samples taken at 4:30 p.m. detected the presence of methanol. Methanol is a listed hazardous substance with a reportable quantity of 5,000 pounds. DuPont failed to notify the NRC until 10:35 p.m. The release totaled 160,000 pounds.

It is additionally alleged that DuPont was required to maintain copies of any material safety data sheets ("MSDSs") regarding hazardous chemicals to which the Belle Facility's employees were exposed. During 2007, DuPont had present at the Belle Facility at least 52,800 pounds of 2,2-azodi (asobutyronitrile), 1,001,350 pounds of 2,4-dimethyl-6-tert-butyl-phenol, 675,000 pounds of amide and imide polymers, 2,273,000 pounds of ammonium bisulfate, 15,000 pounds of chloroform, 15,000 pounds of cyclohexanecarbonitrile, 1, 1-azobis, 20,033 pounds of diethylcarbomethoxyphosphate, 1,189,000 pounds of methylacrylate polymers, and 15,000 pounds of pentanenitrile, 2,4-dimethyl, 2,2-azobis.

DuPont was required to submit to various agencies, and the local fire department, by March 1, 2008, an Emergency and Hazardous Chemical Inventory Form identifying and discussing these substances. DuPont failed, however, to even reflect the aforementioned hazardous substances on the applicable form.

B.  The Complaint

On August 27, 2014, the United States instituted this action against DuPont seeking the assessment of civil penalties and injunctive relief pursuant to section 113(b) of the Clean Air Act ("Act"), 42 U.S.C. § 7413(b), Section 325 of the

Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11045, and Section 109(c) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9609(c).

The United States alleges violations of sections 112(r)(1) and 112(r)(7) of the Act, 42 U.S.C. § 7412(r)(1) and (r)(7), violations of the emergency release notification requirements of section 103 of CERCLA, 42 U.S.C. § 9603, and section 304 of EPCRA, 42 U.S.C. § 11004, and violations of certain requirements of section 312 of EPCRA, 42 U.S.C. § 11022. The United States' complaint contains eleven counts arising out of the aforementioned misconduct:

> COUNT 1:  Failure to Ensure That Equipment Complies With Recognized and Generally Accepted Good Engineering Practices in Violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.65(d)(2);
>
> COUNT 2:  Failure to Update and Revalidate Process Hazard Analysis in Violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.67(f);
>
> COUNT 3:  Failure to Develop and Implement Operating Procedures in Violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.69(a) and (c);
>
> COUNT 4:  Failure to Comply with Inspection and Testing for Mechanical Integrity in Violation of 42 U.S.C. § 112(r)(7) and 40 C.F.R. § 68.73(d);
>
> COUNT 5:  Failure to Comply with Equipment Deficiencies for Mechanical Integrity in Violation of 42 U.S.C. § 112(r)(7) and 40 C.F.R. § 68.73(e);

> COUNT 6:  Failure to Develop and Implement an Adequate Emergency Response Program in Violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.95;
>
> COUNT 7: Methyl Chloride Release: Failure to Identify Hazards Which May Result from Such Releases Using Appropriate Hazard Assessment Techniques, To Design and Maintain a Safe Facility Taking Such Steps as are Necessary to Prevent Releases, and to Minimize the Consequences of Accidental Releases Which do Occur in Violation of 42 U.S.C. § 112(r)(1);
>
> COUNT 8: Failure to Identify Hazards Which May Result from Such Releases Using Appropriate Hazard Assessment Techniques, To Design and Maintain a Safe Facility Taking Such Steps as are Necessary to Prevent Releases, and to Minimize the Consequences of Accidental Releases Which do Occur in Violation of 42 U.S.C. § 112(r)(1);
>
> COUNT 9: Failure to comply with CERCLA Section 103(a);
>
> COUNT 10: Failure to comply with EPCRA Sections 304(a) and 304(c); and
>
> COUNT 11: Failure to comply with EPCRA Section 312;

The remedy sought by the United States for these multiple violations is stated only generally, in essence, as injunctive relief coupled with the assessment of a civil penalty of up to $32,500 per day for each violation occurring between March 15, 2004, and January 12, 2009, and up to $37,500 per day for each violation occurring thereafter.

**C.    The Proposed Consent Decree**

On August 27, 2014, the United States filed a proposed consent decree covering the claims in this action.  It requested that no action be taken pending conclusion of the public comment period on October 3, 2014.  On October 17, 2014, the United States moved for entry of the proposed consent decree.  As noted, on November 12, 2014, it moved to substitute the proposed consent decree, which the court has allowed.  In sum, the proposed consent decree requires DuPont (1) to pay a $1,275,000 civil penalty to resolve the United States' claims, and (2) as observed by the United States, "to perform injunctive relief including enhanced training, formal reviews of its safety procedures, and annual reporting to resolve the Plaintiffs' civil claims described in the complaint."  (Memo. in Supp. at 2).

The memorandum in support of the proposed consent decree is brief, spanning only five and one quarter pages in length.  It is composed almost entirely of prefatory language and boilerplate.  For example, respecting the all-important consideration of fairness and the absence of collusion, the United States conclusorily asserts as follows:

> Through months of arm's length negotiations, the

> parties had the opportunity to explore each other's
> positions regarding Defendant's Clean Air Act, CERCLA
> and EPCRA compliance issues at Defendant's facility.
> Negotiations were based on information presented in
> Region III EPA's numerous inspection reports for the
> facility, Defendant's responses to EPA information
> requests, and further information obtained by the
> Environmental Protection Agency and shared with the
> defendant during the settlement negotiations.

(Id. at 4).

DuPont has consented to entry of the proposed consent decree without further notice. Indeed, counsel has failed to even notice an appearance on DuPont's behalf.

II.

Our court of appeals has observed that "a consent decree 'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." Szaller v. American Nat. Red Cross, 293 F.3d 148, 152 (4th Cir. 2002) (quoting Smyth v. Rivero, 282 F.3d 268, 279-80 (4th Cir. 2002)); see also Local No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland, 478 U.S. 501, 519 (1986); United States v. ITT Continental Baking Co., 420 U.S. 223, 237 n.10 (1975) (citation omitted); Alexander v. Britt, 89 F.3d 194, 199 (4th Cir. 1996).

It has expanded upon this principle in <u>Smyth</u>, observing that a court is expected, when presented with a proposed consent decree, to scrutinize the accord and make certain findings prior to entry:

> Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court. As Judge Rubin noted in <u>United States v. Miami</u>,
>
>> Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should. . . examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.
>
> 664 F.2d at 441 (Rubin, J., concurring). In other words, a court entering a consent decree must examine its terms to ensure they are fair and not unlawful.

<u>Smyth</u>, 282 F.3d at 280.

The standards governing consideration of a proposed consent decree are described further by <u>United States v. North Carolina</u>, 180 F.3d 574, 581 (4th Cir. 1999):

> In considering whether to enter a proposed consent decree, a district court should [1] be guided by the general principle that settlements are encouraged. Nevertheless, a district court should not blindly accept the terms of a proposed settlement. See <u>Flinn v. FMC Corp.</u>, 528 F.2d 1169, 1173 (4th Cir.1975).

15

> Rather, before entering a consent decree the court must satisfy itself that [2] the agreement "is fair, adequate, and reasonable" and [3] "is not illegal, a product of collusion, or against the public interest." United States v. Colorado, 937 F.2d 505, 509 (10th Cir. 1991). In considering the fairness and adequacy of a proposed settlement, the court _must assess the strength of the plaintiff's case_. See Flinn, 528 F.2d at 1172-73. While this assessment does not require the court to conduct "a trial or a rehearsal of the trial," _the court must take the necessary steps to ensure that it is able to reach "an informed, just and reasoned decision_." Id. (internal quotation marks omitted). In particular, the "court should consider _the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement_." Carson v. American Brands, Inc., 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, Circuit Judge, dissenting), adopted by Carson v. American Brands, Inc., 654 F.2d 300, 301 (4th Cir. 1981) (en banc)(per curiam).

Id. at 581 (emphasis supplied).

### III.

The allegations in this action are quite serious. For example, the United States points to a number of preventable releases of hazardous substances, multiple failures to report the same, and the death of at least one worker due to safety and maintenance lapses. In the face of these allegations, the brevity of the United States' written offering in support of the proposed consent decree is perplexing. Aside from that

observation, the minimal offering precludes the court from conducting the analysis required by controlling precedent. For instance, the court is unaware of the regulator's basis for arriving at the chosen civil penalty. The court is also unable to ascertain the strength of the United States' case against DuPont and the efforts undertaken, and the information considered, by both sides in arriving at the proposed accord.

In comparison, the court notes that the last consent decree it entered, in the case of <u>United States v. Alpha Natural Resources, Inc.</u>, No 2:14-11609 (S.D. W. Va.), was accompanied by a 29-page memorandum in support. Attached to the motion to enter the proposed consent decree were three declarations, including one by the Lead Environmental Scientist in Region III of the EPA. That declaration alone, without considering reference to its handling of public comments, covered approximately thirty pages. Several pages were devoted to discussing calculation of the civil penalty in that case.

The court declines at this point to reject the proposed consent decree. It is also precluded by law from modifying it. In an effort to properly develop the matter, however, such that the court may appropriately discharge its duty to pass on the proposal, it is ORDERED that the United States be, and hereby is, directed to file on or before May 26,

17

2015, a revised memorandum in support that explains the strength of its case, the nature of the proposed consent decree, and those considerations relevant to determining whether it is fair, adequate and reasonable, including the method by which the civil penalty was calculated and the efforts undertaken, and materials considered, in arriving at the proposed settlement.  It is further ORDERED as follows:

1. That the United States be, and hereby is, directed to provide an inventory of the number and nature of the various per diem violations applicable to the claims alleged in the complaint; and

2. That the United States be, and hereby is, directed to disclose whether the remediation steps to be taken under the proposed consent decree, or any of them, are already, absent the proposed consent decree, an obligation imposed by statute or regulation.

The revised memorandum in support must also address the following matters:

| Citation | Matter Raised |
| --- | --- |
| Page 3, ¶ 4 | This provision should also require any successor, assignee, parent, subsidiary, or like transferee, subsequently exercising authority and control over the Belle Facility, to expressly assume in writing all of the obligations imposed by the proposed consent decree, with such written agreement to be delivered to the EPA at least 30 days prior to any such transfer. |

| Page 6, ¶ 11 | The first sentence of this paragraph states: "As of June 2011, Defendant has and will continue to permanently cease operations of the SAR Unit and the Phosgenation Process at the Facility." (Prop. Consent Dec. at 6 (emphasis added)). The second sentence of this paragraph states that DuPont "has no plan to resume operations of the SAR Unit or the Phosgenation Process at the Facility." (Id. (emphasis added)). It is thus unclear if DuPont will permanently discontinue these two production components. Additionally, the parties should advise what procedures will be necessary if either the SAR Unit or the Phosgenation Process is proposed for reignition in the future. |
|---|---|
| Passim | At various points in the proposed accord, certain reporting obligations continue only for the first and second anniversaries of the effective date of the proposed consent decree. The parties should discuss the basis for choosing to limit temporally the reporting obligations and explain why the reporting obligations were not imposed on an annual basis up to the time the proposed consent decree is terminated. |
| Page 10, ¶ 15 | The second sentence of this paragraph provides that certain "certification reports [at paragraphs 12.a, 13.a, and 14.e] . . . are not subject to review and approval . . . ." The parties should explain why those reports are excepted. |
| Page 12, ¶ 22 | The final sentence of this paragraph mentions that a certain "certification requirement does not apply to emergency or similar notifications where compliance would be impractical." (Prop. Consent Dec. at 12). In its present form, the court is unable to ascertain the precise scope of this carve out. The parties are directed to further elaborate upon their intentions respecting this provision. |
| Page 15, ¶ 31 | It is stated in this paragraph that "The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree." (Prop. Consent Dec. at 15). The parties should provide to the court the name or position of the individual, or individuals, who |

|  | are vested with the necessary discretion to accomplish the reduction or waiver. |
|---|---|

Additionally, inasmuch as the court may have need to schedule a hearing in this matter depending upon the materials furnished in compliance with this order, it is further ORDERED that counsel for the defendant be, and hereby is, directed to notice an appearance herein on or before May 15, 2015. Counsel for the United States is thus directed to serve a copy of this memorandum opinion and order upon counsel for DuPont forthwith and no later than May 1, 2015. The court contemplates setting a hearing on this matter following receipt of the aforementioned materials.

Once counsel for defendant has noticed an appearance, he or she must forthwith file a certificate of authority disclosing that the defendant's signatory on the proposed consent decree is duly authorized to bind the corporation on those matters set forth in the accord.

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

DATED: April 24, 2015

John T. Copenhaver, Jr.
United States District Judge