## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

E. I. du Pont de Nemours and Company

    *Defendant*.

Civ. Action No. 2:14-cv-25143
Hon. John T. Copenhaver, Jr.

### THE UNITED STATES' REVISED MEMORANDUM IN SUPPORT OF ITS MOTION TO ENTER THE CONSENT DECREE

Plaintiff, the United States of America ("United States"), on behalf of the Environmental Protection Agency ("EPA"), hereby respectfully moves the Court to sign the attached Proposed Consent Decree, first lodged with this Court on August 27, 2014 in Civil Action no. 2:14-cv-25143 ("proposed Consent Decree") and substituted by a revised proposed Consent Decree, correcting a typographical error, on November 12, 2014. Mot. to Substitute Proposed Consent Decree, ECF No. 6-1.

This Motion is unopposed: Defendant specifically consented to the entry of the proposed Consent Decree "without further notice." Proposed Consent Decree ¶ 71. Nevertheless, on October 16, 2014 counsel for Plaintiff notified counsel for Defendant that this Motion was to be filed as an "unopposed" motion.

The proposed Consent Decree requires E.I. du Pont de Nemours and Company ("Defendant") to pay a $1,275,000 civil penalty to resolve the United States' claims for violations of Section 112(r)(1) and r)(7) of the Clean Air Act ("CAA"), 42 U.S.C. § 7412(r)(1) & (r)(7), the emergency release notification requirements of Section 103 of the Comprehensive

1

Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603 and

Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42

U.S.C. § 11004, and the emergency hazardous chemical inventory form requirement of Section

312 of EPCRA, 42 U.S.C. § 11022, which occurred at Defendant's chemical production facility

in Belle, West Virginia, as asserted in the Plaintiff's  Complaint, ECF No. 1.   The proposed

Consent Decree imposes injunctive relief requirements designed to ensure that Defendant

remains in compliance and responds promptly to chemical releases. Decl. of Mary Hunt in Supp.

Of Mot. To Enter ("Hunt Decl.") at ¶¶33, 47, 53.  Defendant will conduct an enhanced training

program, including an extensive training exercise for responding to and reporting emergency

releases.  Hunt Decl. at ¶31; Decl. of Paresh Pandya in Supp. Of Mot. To Enter Consent Decree.

("Pandya Decl.") at ¶¶29-33.   Defendant will conduct a heightened review of its alarm response

and management of change procedures and will submit annual certifications of these reviews to

EPA to certify that Defendant is complying with the most up-to-date industry standards for

accidental release prevention.   Hunt Decl. at ¶¶27-31.  The United States and Defendant both

support entry of the Consent Decree.

The 30 day public comment period required by Section XX of the proposed Consent

Decree and 28 C.F.R. § 50.7 expired on October 3, 2014, and no comments were received.

As discussed below, the proposed Consent Decree is fair, adequate, reasonable, and in the public

interest.  Agreement was reached only after substantial information was collected and the parties

engaged in lengthy negotiations involving experienced counsel.  Hunt Decl. at ¶¶17-23, Pandya

Decl. at ¶¶20-26.  In 2010 and 2011, Defendant complied with a unilateral administrative

enforcement order ("UAO") issued by EPA in March 2010, which required substantial corrective

measures in response to the January 2010 release events.  Decl. of Michael Welsh in Supp. Of

2

Mot. To Enter Consent Decree ("Welsh Decl.") at ¶12, 13, 15; Hunt Decl. at ¶11.  This Proposed

Consent Decree requires a significant penalty and injunctive relief, which goes beyond statutory

obligations and is consistent with settlements for violations of these statutes.  Hunt Decl. at ¶51;

Pandya Decl. at ¶50.   Further, the injunctive relief which complements the substantial work

Defendant completed in accordance with the March 2010 UAO, is a fair and reasonable means to

ensure that Defendant improves its responsiveness to chemical releases.  Hunt Decl. at ¶¶47, 50,

53; Welsh Decl. at ¶20; Pandya Decl. at ¶¶49, 51.   Entry of the proposed Consent Decree avoids

the significant expenditure of time and resources that litigation would entail.  Accordingly, the

United States respectfully requests that the Court approve and sign the Consent Decree lodged on

August 27, 2014 and substituted with a proposed Consent Decree correcting a typographical

error on November 12, 2014 and enter it as final judgment in this matter.

## BACKGROUND

### I.        COMPLAINT VIOLATIONS

On August 27, 2014, the United States filed a complaint pursuant to the CAA, 42 U.S.C.

§ 7401 *et seq*. against Defendant.  The complaint alleged that Defendant violated Section

112(r)(1) and (r)(7) of the CAA, 42 U.S.C. § 7412(r)(1) & (r)(7), the emergency release

notification requirements of Section 103 of CERCLA, 42 U.S.C. § 9603 and Section 304 of

EPCRA, 42 U.S.C. § 11004, and the emergency hazardous chemical inventory forms

requirement of Section 312 of EPCRA, 42 U.S.C. § 11022, at Defendant's chemical production

facility in Belle, West Virginia. *See* Pl.'s Compl., ECF No. 1.

The CAA Section 112(r) violations stem from three serious releases of extremely

hazardous substances (methyl chloride, oleum and phosgene) occurring within a 33-hour period

at the Defendant's chemical production facility in Belle, West Virginia.  Section 112(r)(1) of the

CAA, informally referred to as the "general duty clause" imposes a general duty on owners and operators of stationary sources producing, processing, handling or storing substances listed pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), or any other extremely hazardous substance, to identify hazards which may result from accidental releases of such substances using appropriate hazard assessment techniques, to design and maintain a safe facility, taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases that do occur.  The United States alleged two violations of the general duty clause in Count 7 and Count 8.  Pl.'s Compl. at ¶¶148-173.  Count 7 alleges that Defendant failed to prevent the release of methyl chloride, when it should have been aware of the risks and taken specific actions to prevent the release.  Pl.'s Compl. at ¶¶148-168.  Specifically the Defendant failed to provide procedures for adequate training when a disk ruptured, and failed to ensure that the training occurred. Hunt Decl. at ¶22.h.  Defendant also failed to install a weephole in a safe location.  Hunt Decl. at ¶22.i.  Count 8 broadly alleges that the number of incidents occurring in a short-time span revealed a pattern of failing to follow industry standards, which the general duty clause is designed to remedy.  Pl.'s Compl. ¶¶169-173; Hunt Decl. at ¶27.

Section 112(r)(7) of the CAA, and implementing regulations at 40 C.F.R. Part 68, Chemical Accident Prevention Provisions, requires owners and operators of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a Risk Management Plan ("RMP") to detect and prevent or minimize accidental releases of such substances from the stationary source and to provide prompt emergency response to any such releases in order to protect human health and the environment.  The complaint, Counts 1-6, alleges six violations of the Chemical Accident Prevention provisions,

each of which is highly fact-intensive and may require opinions by industry experts to support these violations.  Pl.'s Compl. at 20-27; Hunt Decl. at ¶21.  These violations include:

- Count 1 - four violations of 40 C.F.R. § 68.65(d)(2) - This provision requires the owner or operator to document that its equipment complies with recognized and generally accepted good engineering practices.  Based on industry practices and industry guidelines, and information exchanged in negotiations, we allege that Defendant (1) failed to have a local alarm in the phosgene shed (2) failed to fully enclose the phosgene shed, (3) failed to properly affix a label on the phosgene hose and (4) failed to use the appropriate heat-tracing method on the sulfuric acid piping.  Hunt Decl. at ¶22.b.

- Count 2 – one violation of 40 C.F.R. § 68.67(f) – This provision requires the owner or operator to update, at least every 5 years, the process hazard analysis, conducted pursuant to 40 C.F.R. § 68.65(a), to reflect changes in industry standards to prevent risks from hazards identified.  We allege that Defendant failed to update its process hazard analysis to recognize the risk of a release from thermal expansion in the hoses in the phosgene unit.  Within the Small Lots Manufacturing ("SLM") Unit (where Defendant uses phosgene) the phosgene was not evacuated during a tank change-out on January 22, 2010, which we allege caused over-pressurization in the hose and contributed to the hose failure.  Hunt Decl. at ¶22.a.

- Count 3 – Three violations of 40 C.F.R. § 68.69(a) and (c) - This provision requires the owner or operator to "develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information. . ."  Here, we allege that Defendant failed to comply with its own written operating instructions in the following three ways: (1)

5

Defendant's written procedures required replacement of the phosgene hose on the SLM unit every two months, but at the time of the release, the hose had not been replaced in over seven months; (2) Defendant's written procedure required that the phosgene gas be evacuated from the hose between transfers, which was not done; and (3) Defendant failed to annually update its operating procedures to reflect the requirement to replace phosgene hoses every two months.  Hunt Decl. at ¶22.d.

- Count 4 – One violation of 40 C.F.R. § 68.73(d) - This provision requires Defendant to perform inspections and tests frequently using generally accepted good engineering practices and consistent with manufacturer recommendations.  The oleum sample line, part of the Sulfuric Acid Recovery ("SAR") Unit, burst causing the release of oleum.  We allege that this line should have been part of a regular preventative maintenance program requiring inspections and tests.  Hunt Decl. at ¶22.f.

- Count 5 – One violation of 40 C.F.R. § 68.73(e) - This provision requires Defendant to ". . . correct deficiencies in equipment that are outside acceptable limits . . . before further use or in a safe and timely manner when necessary means are taken to assure safe operation."  We allege that Defendant's failure to use the proper material in the hoses in the phosgene process violates this provision.  Hunt Decl. at ¶22.e.

- Count 6 – One violation of 40 C.F.R. § 68.95 - This provision requires Defendant to "develop and implement an emergency response program for the purpose of protecting public health and the environment." 40 C.F.R. § 68.95(a).  The emergency response plan requires procedures for informing the public and local emergency response agencies about accidental releases.   We allege that Defendant failed to properly inform emergency responders of the circumstances of the release before their arrival.  Hunt Decl. at ¶22.g.

The CERCLA and EPCRA claims are alleged due to Defendant's failure to timely report five release events, based on inspections and review of information provided by Defendant, and information exchanged between federal and state agencies.  Pandya Decl. at ¶¶9-16; Hunt Decl. at ¶13.  Specifically, between May 4, 2006 and September 20, 2010 there were five separate releases of hazardous substances exceeding the reportable quantity ("RQ") from the Facility which form the basis of the CERCLA and EPCRA claims: a May 4-6, 2006 release of 8100 lbs. of ethyl chloride ("ECl"); a December 9, 2006 release of 6,054 lbs. of trimethylamine ("TMA"); a December 22, 2008 release of 5,412 lbs. of phosphoric acid; a January 22, 2010 release of 2,045 lbs of  methyl chloride ("MCl"); and a September 21, 2010 release of 160,000 lbs. of methanol.  Pandya Decl. at ¶24.

Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and its implementing regulations at 40 C.F.R. § 302.6 require a person in charge of a facility to immediately notify the National Response Center ("NRC") as soon as he has knowledge of a release (other than a federally permitted release) of a hazardous substance from such facility in an amount equal to or greater than the RQ of that substance.  To establish that a defendant is subject to the notification requirements for an accidental release under 40 C.F.R. § 302.6, the United States must prove that the defendant (1) is a person in charge of an onshore facility (2) from which there was a "release" of (3) a hazardous substance (4) in a quantity equal to or exceeding the RQ in any 24 hour period, and that the defendant (5) failed to immediately notify the NRC of the release.  *See Sierra Club v. Tyson Foods*, 299 F. Supp, 2d 693, 701 (W.D. Ky., 2003).

The United States' complaint alleges five claims under CERCLA Section 103, because Defendant failed to immediately notify the NRC that all five releases occurred above the RQs.

Pl.'s Compl. at 31.  Whether the quantity reached a certain level and whether the response was provided "immediately" are highly fact intensive inquiries.  Pandya Decl. at ¶24.

Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), as implemented by 40 C.F.R. Part 355, Subpart C, requires, in relevant part, the owner or operator of a facility at which hazardous chemicals are produced, used, or stored to notify the State Emergency Response Commission ("SERC") and the Local Emergency Response Planning Committee ("LEPC") immediately following a release of a CERCLA hazardous substance or an EPCRA extremely hazardous substance[1] in a quantity equal to or exceeding the RQ for the hazardous substance or extremely hazardous substance.   Thus, to establish that a defendant is subject to notification requirements for an accidental release under Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), and 40 C.F.R. § 355.40(b)(1), the United States must prove that the defendant (1) owns or operates a facility at which a (2) hazardous chemical is produced, used or stored and (3) at which there is a release of a (4) RQ of (5) an EPCRA extremely hazardous substance or a CERCLA hazardous substance (6) which spreads beyond site boundaries, and that the defendant (7) failed to immediately provide notice to the (8) community emergency coordinator for the Local Emergency Planning Committee ("LEPC") for any area likely to be affected by the release and (9) to the State Emergency Response Committee ("SERC") of any state affected by the release.

Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), and 40 C.F.R. § 355.40(b), require the owner or operator to provide a written follow-up notice to the community emergency coordinator for the LEPC and the SERC as soon as practicable after a release.

---

[1] An extremely hazardous substance for purposes of EPCRA is defined at Section 329(3) of EPCRA, 42 U.S.C. § 11049(3) and 40 C.F.R. § 355.61, and is listed at 40 C.F.R. Part 355, Appendix A.

The Complaint alleges violations of EPCRA Section 304(a), 304(c) and Section 312. The EPCRA Section 304(a) claims stem from Defendant's failure to immediately notify both the SERC and the LEPC for 4 of the 5 releases (notice was provided for the TMA release).  Pl.'s Compl. at 31, 34.  Pandya Decl. at ¶25.a.  Defendant failed to submit follow-up reports, required by CERCLA Section 304(c), for the ECl and methanol releases.  Pandya Decl. at ¶25.b. Finally, as required by EPCRA Section 312, Defendant failed to submit chemical inventory forms (also called Tier II reports) to the SERC, the LEPC and the fire department for year 2007.  Pl.'s Compl. at 35; Pandya Decl. at ¶25.c.  Tier II reports are Emergency and Hazardous Chemical Inventory Forms that identify the hazardous chemicals and information related to those chemicals at the Site.  Pandya Decl. at ¶25.c.  The purpose of the Tier II reports is to provide responders with information on the dangers of the chemicals being used in their communities and to specify where such chemicals may be encountered at the facilities during emergencies. Pandya Decl. at ¶25.c.  Like the CERCLA release reporting violations, the key elements of an EPCRA claim, whether the quantity released reached a certain level, and whether the notification was provided "immediately" are fact intensive.  Pandya Decl. at ¶24.  In addition, whether the release exceeded site boundaries requires expert air modeling.  Pandya Decl. at ¶8.

## II.     ENFORCEMENT BACKGROUND

### A.     Administrative Enforcement Efforts Related to Clean Air Act Section 112(r)(1) and Section 112(r)(7) Compliance

A release of methyl chloride occurred at the Belle Facility on January 22, 2010.  Hunt Decl. at ¶8, Welsh Decl. at ¶7.  The next day a release of oleum occurred from a sampling line in

the SAR Unit at the Facility on January 23, 2010. Hunt Decl. at ¶8, Welsh Decl. at ¶7.   Later

that day, a release of phosgene occurred at the SLM Unit at the Facility.  Hunt Decl. at ¶8, Welsh

Decl. at ¶7.  A worker who had been exposed to the phosgene during the release later died on

January 24, 2010.  Hunt Decl. at ¶8, Welsh Decl. at ¶7.

As a result of the three release events on January 22 and 23, 2010, EPA conducted an

inspection of the Facility pursuant to Section 114 of the CAA, 42 U.S.C. § 7414, on February 2,

2010 ("February 2010 inspection"), to determine whether the Facility was in compliance with

Section 112(r)(1) and (7) of the CAA and implementing regulations at 40 C.F.R. Part 68.  Hunt

Decl.  at ¶9,   Welsh Decl. at ¶8.   The EPA investigation of the Facility consisted of an on-site

visit and discussions with witnesses at the Facility.   Welsh Decl. at ¶9;  Hunt Decl. at ¶¶9-10.

EPA identified violations of CAA Section 112(r)(1) and (7), related to Defendant's failure to

implement its own standard operating procedures ("SOPs"); and determined that immediate

mitigation was warranted.  Hunt Decl. at ¶10; Welsh Decl. at ¶11.

On March 18, 2010, EPA issued a UAO to Defendant, as the owner and operator of the

Facility, ordering it to comply with the general duty clause of Section 112(r)(1) of the CAA.

Hunt Decl. at ¶10; Welsh Decl. at ¶12.   EPA found that the absence of and/or the inadequate

implementation of SOPs and/or generally-recognized industry standards at the Facility,

constitute a failure by Defendant to identify hazards, to take steps to prevent releases and to

minimize the consequences of accidental releases.  Hunt Decl. at ¶10; Welsh Decl. at ¶¶11, 14.

Specifically, the Order required Defendant  to: 1) implement existing SOPs at the Facility, 2)

review the process hazard analyses ("PHAs") for all covered processes and propose and

implement Management of Change ("MOC") procedures that may require modification of

applicable SOPs, 3) prepare and implement a comprehensive training program for handling and

10

use of phosgene, 4) prepare and implement a comprehensive training program on existing and newly developed SOPs, and 5) submit incident investigation reports for the releases of MCl, oleum, and phosgene.  Hunt Decl. at ¶11; Welsh Decl. at ¶12.

Defendant complied with the Order by conducting the work in accordance with the directed schedule and by submitting timely reports.  Hunt Decl. at ¶11; Welsh Decl. at ¶13.  On December 7, 2011, following the completion of all of the work required by the Order, EPA terminated the Order.   Hunt Decl. at ¶11; Welsh Decl. at ¶15.

**B.** **Enforcement Efforts Regarding Judicial Referral for Civil Action Stemming from the Releases**

EPA conducted two inspections of the Facility, in April 2007 and January 2009, and conducted other investigation activities to determine compliance with Section 103 of CERCLA, 42 U.S.C. § 9603, and Sections 302-312 of EPCRA, 42 U.S.C. §§ 11002-11022.  Pandya Decl. at ¶¶9-11.  During the February 2010 inspection, EPA also investigated whether Defendant had complied with the notification requirements of CERCLA and EPCRA for the MCl release. Pandya Decl. at ¶¶12-14; Hunt Decl. at ¶13.  During EPA's series of investigations it discovered violations of the emergency release notification requirements of Section 103 of CERCLA, 42 U.S.C. § 9603(a), and/or Section 304 of EPCRA, 42 U.S.C. § 11004, in connection with a May 6, 2006 release of ECl, a December 9, 2006 release of TMA, a December 22, 2008 release of phosphoric acid, a January 22, 2010 release of MCl, and a September 21, 2010 release of methanol.  Pandya Decl. at ¶¶9, 11, 14, 15, 24 and 25.  Moreover, EPA determined that the Defendant had violated the emergency and hazardous chemical inventory forms requirement of Section 312 of EPCRA, 42 U.S.C. § 11022, at the Facility by failing to submit timely Tier II

11

reports.  Pandya Decl. at ¶25.  In summary EPA's investigations of Defendant's compliance with the EPCRA and CERCLA reporting requirements revealed 14 violations.  Pl.'s Compl. at Count 9, 10 and 11.

As discussed above, EPA inspected the Facility in February 2010 to determine CAA 112(r) compliance.  Certain noncompliance with the general duty clause warranted an immediate enforcement response, and those issues were addressed by Defendant in compliance with the UAO.  Hunt Decl. at ¶¶10-11.  EPA sought follow-up information from Defendant including its release response manuals and SOPs to determine if lack of compliance with Facility SOPs or inadequate response measures may have contributed to the MCl, oleum and phosgene releases. Hunt Decl. at ¶12.  Defendant provided voluminous records and documents in response to the information request. Hunt Decl. at ¶¶12.  Through its inspection and review of materials, including materials from other state and federal investigations, EPA determined that Defendant violated several requirements of the Chemical Accident Prevention provisions, 40 C.F.R. Part 65,  related to the phosgene and oleum releases, and recommended additional measures be taken. Hunt Decl. at ¶¶12, 14; Welsh Decl. at ¶¶9, 17.  Thus, EPA prepared a judicial referral, requesting that the Department of Justice take action to resolve the CERCLA and EPCRA violations for the TMA, ECl, MCl and methanol releases and the violations of CAA Section 112(r)(1) and (7).  Pandya Decl. at ¶18; Hunt Decl. at ¶14.

While EPA investigated the information related to the January 2010 releases, the United States and Defendant entered into tolling agreements to preserve any potential claims and to allow time for negotiations.  Pandya Decl. at ¶17; Hunt Decl. at ¶15.  In August 2013, the United States Department of Justice officially notified Defendant that EPA had referred claims for CAA,

CERCLA and EPCRA violations against the company for potential legal action, and invited Defendant to engage in pre-filing negotiations.  Pandya Decl. at ¶19; Hunt Decl. at ¶16.

### C.    Settlement Negotiations with Defendant

In August 2013, the Defendant was notified by the United States that a matter had been referred by EPA to initiate civil litigation and provided Defendant with an opportunity to engage in settlement discussions.  Pandya Decl. at ¶19; Hunt Decl. at ¶16.  Over the next several months, Defendant provided the United States with additional information to consider with respect to the claims.  Pandya Decl. at ¶¶22-23; Hunt Decl. at ¶¶19-20.  This included Facility-specific information and also general information relied on by the industry for appropriate standard operating procedures, safety prevention standards and hazard guidelines.  Hunt Decl. at ¶20.  The parties engaged in settlement negotiations over the next year, including numerous face to face meetings and countless teleconferences, letters, and emails in an attempt to resolve the parties' differences over the appropriate injunctive relief and civil penalty.  Hunt Decl. at ¶20, 25; Welsh Decl. at ¶19.  During this time period, the United States consulted technical specialists, scientists within EPA with technical expertise, and specialists within other federal agencies to discuss the circumstances of Defendant's violations and evaluate potential remedies. Hunt Decl. at ¶¶19, 51; Pandya Decl. at ¶¶22, 49. Within the year, the parties exchanged multiple drafts of proposed injunctive relief, and exchanged writings on elements related to the penalty which led the parties to ultimately reach agreement.  Pandya Decl. at ¶¶22, 26, 28, 48; Hunt Decl. at ¶¶19, 23, 25.

### D.    Public Comment Period

Simultaneous to the filing of the complaint, the Plaintiff lodged the proposed Consent Decree together with a "Notice of Lodging and Request that the Court Take No Action at this

Time," requiring Defendant to pay a $1,275,000 penalty and to perform injunctive relief including enhanced training, formal reviews of its safety procedures, and annual reporting to resolve the Plaintiff's civil claims described in the complaint.  *See* proposed Consent Decree, ECF Nos. 3-1 and 6-1. Pandya Decl. at ¶¶28-32; Hunt Decl. at ¶¶28-32.  The United States filed a motion to substitute the proposed Consent Decree, due to a typographical error, on November 12, 2014.  That motion was granted on April 24, 2015.  ECF No. 8 at 1.

The United States published notice of the proposed Consent Decree in the Federal Register on September 3, 2014 as required by Section XX of the proposed Consent Decree and 28 C.F.R. § 50.7.  79 Fed. Reg. 52363.  The 30 day public comment period expired on October 3, 2014, and no comments were received.  Pandya Decl. at ¶50, Hunt Decl. at ¶52.  As explained below, the Court should enter the Consent Decree because the settlement reached by the parties is fair, adequate, and reasonable, and is not illegal, a product of collusion, or against the public interest.  The parties reached this settlement agreement after a careful and informed assessment of the merits, costs, risks, and delays that litigation would entail, as well as the benefits of settlement.

## II.    TERMS OF SETTLEMENT

The proposed Consent Decree includes two major components: injunctive relief designed to improve Defendant's prevention of, response to, and reporting of accidental chemical releases and a civil penalty.   See Proposed Consent Decree at 5, 6.   The Proposed Consent Decree resolves Defendant's civil liability for the specific violations alleged in the complaint; the United States has not waived the right to bring an action for any violations not alleged in the Complaint, including future violations.  See proposed Consent Decree at ¶54.

### A.    Civil Penalty

The proposed Consent Decree requires Defendant to pay a civil penalty of $1,275,000

($417,560 for CERCLA and EPCRA and $857,440 for CAA).  Pandya Decl. at ¶¶36, 48, Hunt

Decl. at ¶37.  This amount exceeds the economic benefit calculated by EPA for the violations at

issue, and was agreed upon after weighing the economic benefit, the extent and environmental

impact of the alleged violations, penalties assessed in similar settlements, consideration of the

statutory penalty factors, and the United States' assessment of the litigation risk associated with

its claims.  Pandya Decl. at ¶¶35- 48 and Hunt Decl. at ¶¶35-46.

### B.    Injunctive Relief to Address CAA 112 Claims, CERCLA and EPCRA Claims

With respect to the CAA claims, the injunctive relief in the proposed Consent Decree has

been thoroughly evaluated to correct the remaining procedural deficiencies that led to

Defendant's CAA violations.  Hunt Decl. at ¶47.  Defendant, for independent business reasons,

decided to permanently shut down its SLM Unit phosgene operations and the SAR Unit oleum

operations.  Defendant has committed to providing a "Closure Report" for both units.  Proposed

Consent Decree § V, ¶11, ECF 6-1.  Because many of the problems resulted from Defendant's

employees failing to respond to alarms as required by the SOPs, Defendant must conduct an

enhanced review of alarms.  Hunt Decl. at ¶¶27-28.  Defendant will provide a revised SOP to

EPA for all active alarms associated with process units covered by the Chemical Accident

Prevention provisions, 40 C.F.R. Part 68.  Proposed Consent Decree §V. ¶12, ECF 6-1; Hunt

Decl. at ¶¶27-28.  In addition, Defendant will prepare and implement a revised SOP for its

management of change ("MOC") to ensure that employees are fully trained and aware of process

changes at the Facility.  Proposed Consent Decree §V. ¶12, ECF 6-1; Hunt Decl. at ¶28.  For two

years after entry of the proposed Consent Decree, Defendant will be required to submit an annual

certification to EPA asserting that its Alarm and MOC SOPs are current, accurate and being implemented.  Proposed Consent Decree §V. ¶¶12 a. and 13 a, ECF 6-1; Hunt Decl. at ¶¶29-30. These injunctive relief measures for the CAA claims, requiring Defendant to submit its SOPs for EPA's review and approval, and requiring certification that SOPs are current, accurate and being implemented are not required by statute.  Hunt Decl. at ¶¶28-29.

The injunctive relief to address the EPCRA and CERCLA violations is intended to improve Defendant's system for reporting releases.  Pandya Decl. at ¶33.  Due to the number of hazardous substance releases for which Defendant failed to provide the required EPCRA and CERCLA notices, Defendant is required, by the proposed Consent Decree to submit an updated "Release SOP" to identify relevant procedures for reporting releases.  Pandya Decl. at ¶¶29-30. Defendant will also conduct a simulated training exercise and provide a report of this exercise to EPA.  Consent Decree §V. ¶14; Pandya Decl. at ¶¶30, 31.  For two years after entry of the proposed Consent Decree, Defendant will annually certify that the Release SOP is current, accurate and being implemented.  Consent Decree §V. ¶¶14.f; Pandya Decl. at ¶32.  By statute, Defendant is not required to submit its SOPs for release reporting to EPA, nor is it required to report on training exercises.  Pandya Decl. at ¶¶28, 31.  These measures, in addition to an assessment and payment of a penalty, are intended to better prepare employees responsible for reporting releases and also result in fewer reporting violations.  Pandya Decl. at ¶33.  The injunctive measures in the proposed Consent Decree were sought by EPA to improve Defendant's emergency response plans and reporting of accidental chemical releases under CERCLA and EPCRA.  Hunt Decl. at ¶¶31-33; Pandya Decl. at ¶¶28-33.

Because Defendant implemented a number of remedial measures in compliance with the UAO, the injunctive relief in the proposed Consent Decree requires Defendant to closely review

16

its release response efforts to ensure that corrective measures taken pursuant to the UAO, in combination with enhanced training, help Defendant to remain compliant with CERCLA, EPCRA and the CAA.  Hunt Decl. at ¶¶47, 53; Pandya Decl. at ¶¶33, 48.  Defendant is expected to incur approximately $2,276,259 to implement the injunctive relief for CAA, CERCLA and EPCRA compliance.  Pandya Decl. at ¶34.  Previously, Defendant incurred an estimated $6,828,750.00 to comply with the UAO. Welsh Decl. at ¶16.  In total, Defendant is expected to incur at least $9,105,000.00 to comply with the injunctive relief required under the UAO and this proposed Consent Decree.  Hunt Decl. at ¶34; Pandya Decl. at ¶34.

### C.        Response to Judicial Inquiry

The United States submits this revised memorandum, which expresses the view of the United States' on the nature of the violations, nature of the consent decree, and other considerations, as requested by the Court.    However, the Court also requested that "the parties" respond to specific matters regarding the settlement terms.  See Mem Opinion and Order, at 18-19 (April 24, 2015), ECF No. 8.   The United States consulted with Defendant for these specific matters raised by the Court.  The United States and Defendant prepared the Joint Statement, attached as Appendix A to this memorandum as a joint response to the matters raised by the Court.

Except with respect to the Joint Statement provided as Attachment A to this Memorandum, the Memorandum constitutes a filing solely by the United States; Defendant has not received the Memorandum prior to its filing with this Court, and therefore states that it cannot take a position as to any statement contained in this Memorandum except as reflected in the Joint Statement.  As is the nature of settlement, while both parties support the entry of the

decree, it is likely that Defendant and the United States have differing views as to the facts supporting the violations and justifications for settlement.

### III.   LEGAL STANDARD FOR ENTRY OF A PROPOSED CONSENT DECREE

The standard to be applied in reviewing the proposed Consent Decree is whether the consent decree "is fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999). A number of over-arching principles apply to the determination of whether a consent decree meets this standard.  First, in examining a proposed consent decree, the district court "should be guided by the general principle that settlements are to be encouraged." *American Canoe Ass'n, Inc. v. U.S.E.P.A.*, 54 F. Supp. 2d 621, 625-629 (E. D. Va. 1999) (quoting *United States v. North Carolina*, 180 F. 3d 574, 581 (4th Cir. 1999)).  Next, "[t]he presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained, or oriented in the field. EPA is such an agency." *United States v. Cannons Eng'g Corp*., 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990) (holding that the consent decree was fair and reasonable and should be approved) (internal citations and quotations omitted).  Where a "government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement, a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility." *Bragg v. Robertson*, 83 F. Supp. 2d 713, 717 (S.D. W. Va. 2000), aff'd, 248 F. 3d 275 (4th Cir. 2001).

Finally, the proposed consent decree must be reviewed in light of what it is – a settlement of claims and not a disposition after trial on the merits. *United States v. Oregon*, 913 F.2d 576, 585 (9th Cir. 1990) (a consent decree "is not a decision on the merits or the

achievement of the optimal outcome for all parties, but is the product of negotiation and

compromise"). Thus, a consent decree may take into account "reasonable discounts for litigation

risks, time savings, and the like that may be justified." *United States v. Davis*, 261 F.3d 1, 26

(1st Cir. 2001). And, in reviewing the proposed Consent Decree, the standard is not whether the

Consent Decree is "one which the court itself might have fashioned, or considers as ideal, but

whether the proposed Consent Decree is fair, reasonable, and faithful to the objectives of the

governing statute." *Cannons Eng'g*, 899 F.2d at 84. The court does not have the power to

modify a consent decree, it may only approve or reject it. *Cannons Eng'g Corp.*, 720 F. Supp.

1027, 1036.

## IV.   THE PROPOSED CONSENT DECREE IS FAIR, ADEQUATE AND REASONABLE AND IN THE PUBLIC INTEREST

The United States submits that the proposed Consent Decree was negotiated at arm's

length and in good faith, addresses the allegations in the Complaint, and is consistent with the

enforcement goals of the CAA, CERCLA and EPCRA, which yields a result that is fair, adequate

and reasonable and in the public interest. See *North Carolina*, 180 F. 3d at 581.

First, the settlement is fair and is not the product of collusion. The proposed Consent

Decree was vetted, examined, and agreed to by the United States and the Defendant after careful

review. The United States and counsel for Defendant engaged in settlement discussions prior to

the United States' filing the complaint. Through months of arm's length negotiations, the parties

had the opportunity to explore each other's positions regarding the United States' claims against

Defendant for violations of the CAA, CERCLA and EPCRA at the Defendant's facility. Hunt

Decl. at ¶19; Pandya Decl. at ¶22; Welsh Decl. at ¶19.   Agreement on the proposed Consent

Decree was reached after several years of investigations and nearly a year of negotiations. Hunt

Decl. at ¶¶17-22; Pandya Decl. at ¶¶20-26; Welsh Decl. at ¶19.  Negotiations were based on

information obtained by EPA's numerous inspections of the Facility, Defendant's responses to

EPA information requests, information obtained from other state and federal agencies, and

information obtained by EPA within the industry and shared with the Defendant during the

settlement negotiations.  Pandya Decl. at ¶¶13, 15, 22-23; Hunt Decl. at ¶¶9, 12, 19-20; Welsh

Decl. at ¶¶9, 11, 14.  In addition, negotiations were conducted by qualified counsel for each

party, who relied on engineers, from both EPA and Defendant, with technical knowledge to

develop opinions on appropriate relief.  Hunt Decl. at ¶¶17-22; Pandya Decl. at ¶¶20-26; Welsh

Decl. at ¶¶18-19.  *See generally* qualifications of Mary Hunt, Paresh Pandya and Mike Welsh,

as described in their respective Declarations.  EPA and Defendant had different opinions on

numerous issues, which were discussed at length in meetings, at phone conferences and through

numerous draft revisions when arriving at an agreed upon consent decree. Pandya Decl. at ¶¶26,

27, 28 and Hunt Decl. at ¶¶19, 20, 23, 25.  Given the extensive efforts investigating the claims,

the level of information exchanged, the expertise of the parties, and the thorough review of

materials exchanged during settlement negotiations, there is ample support to show the

settlement was fair and well informed.  *United States v. North Carolina*, 180 F.3d 574, 581 (4th

Cir. 1999); *United States v. Patriot Coal Corp*., No. 2:09-0099, 2009 WL 1210622 (S.D. W. Va.

Apr. 30, 2009), United *States v. Alpha* Resources, Case 2:14-cv-11609, 2014 WL 6686690  (S.D.

W. Va. Nov. 26, 2014).  Further, the general public had an opportunity to comment.  The

proposed Consent Decree was published for a 30-day public comment period, during which no

comments were received. Pandya Decl. at ¶50, Hunt Decl. at ¶52.

Second, the proposed Consent Decree is adequate and reasonable because it is designed

to penalize Defendant for the violations alleged in the complaint and to serve as a deterrent to

future conduct by Defendant and other potential industry violators.  Further, the compliance measures are designed to specifically resolve the alleged violations.  Hunt Decl. at ¶¶33, 47-51; Pandya Decl. at ¶¶28-33, 49.  The settlement secures injunctive relief that may not be available in litigation.  Hunt Decl. at ¶29; Pandya Decl. at ¶¶28, 31.  This negotiated injunctive relief requires a heightened review of workplace practices, additional training to prevent accidents and/or future releases, and training to ensure prompt and accurate reporting of any future accidental release.  Hunt Decl. at ¶¶47, 53; Pandya Decl. at ¶¶32, 48.  These provisions are, based on the technical judgment of the Plaintiff, more than adequate to address all the violations at issue and promote the objectives of the CAA, EPCRA and CERCLA.  Hunt Decl. at ¶¶19, 49, 51; Pandya Decl. at ¶¶22, 49; Welsh Decl. at ¶20. *See Bragg*, 83 F. Supp. 2d at 717 ("a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility"); *United States v. Akzo Coatings*, 949 F.2d 1409, 1437 (most important factor in determining reasonableness of a consent decree is degree to which the remedy will adequately address the harm).  By reaching this carefully negotiated settlement intended to ensure compliance and deter future violations, EPA also avoids the unnecessary expense of complex litigation, and is able to devote its resources to other investigations to prevent harm to the public from other violations of these statutes occurring within Region III.  *United States v. Alpha Resources*, Case 2:14-cv-11609, 2014 WL 6686690 *9 (S.D. W. Va. Nov. 26, 2014).

Third, the settlement is not illegal or against the public interest.  On the contrary, as noted above, the proposed Consent Decree achieves the goal of deterrence through a penalty that removes the economic benefit of noncompliance and reflects the gravity of the violations. As discussed at length in the Declaration of Mary Hunt, for the CAA claims, EPA took all of the statutory factors into account in developing its settlement position on civil penalty, including the

size of the business; the economic impact of the civil penalty on the business; the violator's full

compliance history and good faith efforts to comply; the duration of the violation as established

by any credible evidence; payment by the violator of penalties previously assessed for the same

violation, the economic benefit of noncompliance; the seriousness of the violation; and other

factors as justice may require.  Hunt Decl. at ¶35.  For the EPCRA claims, as described at length

in the Declaration of Perry Pandya, EPA considered the statutory factors for civil penalty

including the nature, circumstances, extent and gravity of the violation and, with respect to the

violator, ability to pay, any prior history of such violations, the degree of culpability, economic

benefit or savings (if any) resulting from the violation, and such other matters as justice may

require.  EPCRA Section 325(c)(1), 42 U.S.C. §11045; Pandya Decl. at ¶35.  EPA also took into

account Defendant's cooperation in complying with the UAO, Defendant's agreement to

undertake additional injunctive relief that otherwise may not have been available, penalties

assessed under similar settlements, and litigation risk. The resulting civil penalty, which far

exceeds the economic benefit received by Defendant and is consistent with EPA policy, is

reasonable and appropriate for the violations.  Hunt Decl. at ¶¶50, 51; Pandya Decl. at ¶¶48, 49;

Welsh Decl. at ¶20.

 Further, as to the civil penalty, were the case to proceed to trial, the United States would

first need to establish Defendant's liability under Section 112(r)(1) and (r)(7) of the CAA, 42

U.S.C. § 7412(r)(1) & (r)(7), the emergency release notification requirements of Section 103 of

CERCLA, 42 U.S.C. § 9603, and Section 304 of EPCRA, 42 U.S.C. § 11004, and the emergency

and hazardous chemical inventory forms requirement of Section 312 of EPCRA, 42 U.S.C. §

11022.  Defendant would be likely to vigorously contest liability.  Inevitably, this would lead to

significant discovery.  For example, to establish the 112(r) violations, EPA would have presented

evidence on the recognized and generally accepted good engineering practices including industry standards and standard operating procedures that Defendant should have been aware of. Hunt Decl. at ¶21. These claims would have required multiple industry experts to present at trial. Hunt Decl. at ¶21.

If Defendant was found liable, the Court would then consider the statutory civil penalty factors listed above and would also hear evidence on recommended remedial measures. As such, the civil penalty reflected in the proposed Consent Decree is fair and reasonable in light of the factors above and considering the risks to both parties that the Court could, if Defendant were found liable, award a penalty either higher or lower than $1,275,000.

To determine whether injunctive relief was warranted, the court would weigh the following factors:

> (1) that [Plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Like the civil penalty, the injunctive relief agreed to in the proposed Consent Decree is fair and reasonable, when considering the risks to both parties that this Court, when considering the factors of *eBay,* may find that the balance does not favor granting a permanent injunction, or may require something additional.

Third, for all the reasons discussed above, the proposed Consent Decree is consistent with the statutes and serves the public interest. The injunctive relief, discussed at length above, is designed to prevent accidental releases of extremely hazardous substances, promote workplace

safety, and ensure prompt and accurate reporting of any future accidental release.  Hunt Decl. at ¶¶47-51; Pandya Decl. at ¶49; Welsh Decl. at ¶20.   This relief is wholly consistent with the objective of CAA Section 112(r) "to prevent the accidental release and to minimize the consequences of any such release" of any extremely hazardous substance. 42 U.S.C. § 7412(r)(1).  Defendant conducted a significant amount of work to address the issues identified in the UAO, and this proposed Consent Decree builds on those measures, to prevent future releases. Hunt Decl. at ¶¶11, 14, 34; Welsh Decl. at ¶¶12, 13, 15, 17, 20.  It is also consistent with the goals of CERCLA and EPCRA release reporting to (1) allow state and local planning for chemical emergencies, (2) provide for notification of emergency releases of chemicals, and (3) address communities' right-to-know about toxic and hazardous chemicals.   Moreover, as an additional incentive for compliance, the proposed Consent Decree includes significant stipulated penalties for Defendant's failure to comply.  Proposed Consent Decree at § IX.  Finally, entry of the Consent Decree would ensure that the compliance measures are immediately implemented by Defendant, would allow recovery of a significant penalty, and would allow EPA to move forward with other compliance investigations, while also avoiding substantial expenditure of taxpayer and judicial resources that would be necessitated by litigation.  *Bragg*, 83 F. Supp. 2d at 717.  ("It is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees. Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation.").  The proposed Consent Decree is consistent with the goal of promoting cost-effective settlement practices, which further the public interest and public health and safety by preserving the limited resources of the government in its efforts to enforce the CAA, CERCLA and EPCRA.

Thus, considering the time, effort, exchange of information between the parties, the consideration of statutory factors and the development of appropriate means to ensure compliance, this proposed Consent Decree is "fair, adequate and reasonable," and not "illegal, a product of collusion, or against the public interest." *North Carolina*, 180 F. 3d at 581.

## CONCLUSION AND REQUEST

For the foregoing reasons, the United States represents to the Court that the proposed Consent Decree is fair, adequate and reasonable and consistent with the goals of the CAA, CERCLA and EPCRA.  The United States, therefore, respectfully requests the Court sign the proposed Consent Decree and enter it as the judgment of the Court in this action.  *See* Proposed Consent Decree, ECF No. 6-1.   Respectfully submitted this 22nd day of May, 2015

R. BOOTH GOODWIN II
United States Attorney

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

s/Gary L. Call
Assistant United States Attorney
WV Bar No. 589
Counsel for United States
United States Attorney's Office
300 Virginia Street, East, Room 4000
Charleston, WV 25301
O: 304-345-2200
F: 304-347-5440
E: gary.call@usdoj.gov

s/ Cara M. Mroczek
CARA M. MROCZEK
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611
Tel.: (202) 514-1447
Fax: (202) 616-6583
E: cara.mroczek@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2015, I caused a copy of the foregoing Revised Memorandum in support of the United States' Motion to Enter Consent Decree to be served on the counsel listed below by ECF notice:

Bart Cassidy, BCassidy@mankogold.com
Michael Dillon, Mdillon@mankogold.com
Lori Sanders, Lori.E.Sanders@dupont.com
Paula Durst, pdurst@spillmanlaw.com


/s/ GARY L. CALL
Assistant United States Attorney