```
              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA

                      AT CHARLESTON


UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Civil Action No. 2:14-25143

E.I. Du PONT de NEMOURS
AND COMPANY

        Defendant.
```

MEMORANDUM OPINION AND ORDER

Pending is the United States' unopposed motion to enter the proposed consent decree, filed October 17, 2014

I.

The court incorporates here section I.B found in the April 24, 2015, memorandum opinion and order describing the complaint in this action. On August 27, 2014, the United States filed a proposed consent decree covering the claims alleged. It requested that no action be taken pending conclusion of the public comment period on October 3, 2014. On October 17, 2014, the United States moved for entry of the proposed consent decree. As noted, on November 12, 2014, it moved to substitute the proposed consent decree, which the court has allowed.

In sum, the proposed consent decree requires DuPont (1) to pay a $1,275,000 civil penalty to resolve the United States' claims, and (2) as observed by the United States, "to perform injunctive relief including enhanced training, formal reviews of its safety procedures, and annual reporting to resolve the Plaintiffs' civil claims described in the complaint."  (Memo. in Supp. at 2).

The original memorandum in support of the proposed consent decree was brief, spanning only five and one quarter pages in length.  The April 24, 2015, memorandum opinion and order sought further elaboration.  Noting the allegations were quite serious, the court observed that "the minimal offering precludes the court from conducting the analysis required by controlling precedent."  (Op. at 17).  The court continued as follows:

> For instance, the court is unaware of the regulator's basis for arriving at the chosen civil penalty. The court is also unable to ascertain the strength of the United States' case against DuPont and the efforts undertaken, and the information considered, by both sides in arriving at the proposed accord.
>
> In comparison, the court notes that the last consent decree it entered, in the case of <u>United States v. Alpha Natural Resources, Inc.</u>, No 2:14-11609 (S.D. W. Va.), was accompanied by a 29-page memorandum in support. Attached to the motion to enter the proposed consent decree were three declarations, including one by the Lead Environmental Scientist in Region III of the EPA. That declaration alone, without

>considering reference to its handling of public
>comments, covered approximately thirty pages. Several
>pages were devoted to discussing calculation of the
>civil penalty in that case.

(Id.)

The United States was directed to file by May 26, 2015, a revised memorandum in support explaining the strength of its case, the nature of the proposed consent decree, and those considerations relevant to determining whether the accord is fair, adequate and reasonable, including the method by which the civil penalty was calculated and the efforts undertaken, and materials considered, in arriving at the proposed settlement.

The court also sought from the United States an inventory of the number and nature of the various per diem violations applicable to the claims alleged, along with a disclosure concerning whether the remediation steps to be taken are already, absent the proposed consent decree, obligations imposed by statute or regulation.

The court also directed the United States to address the following matters found in the proposed consent decree:

| Citation | Matter Raised |
|---|---|
| Page 3, ¶ 4 | This provision should also require any successor, assignee, parent, subsidiary, or like transferee, subsequently exercising authority and control over the Belle Facility, to expressly assume in writing all of the |

3

| | |
|---|---|
| | obligations imposed by the proposed consent decree, with such written agreement to be delivered to the EPA at least 30 days prior to any such transfer. |
| Page 6, ¶ 11 | The first sentence of this paragraph states: "As of June 2011, Defendant has and will continue to <u>permanently cease</u> operations of the SAR Unit and the Phosgenation Process at the Facility." (Prop. Consent Dec. at 6 (emphasis added)).  The second sentence of this paragraph states that DuPont "<u>has no plan</u> to resume operations of the SAR Unit or the Phosgenation Process at the Facility."  (<u>Id.</u> (emphasis added)).  It is thus unclear if DuPont will permanently discontinue these two production components.  Additionally, the parties should advise what procedures will be necessary if either the SAR Unit or the Phosgenation Process is proposed for reignition in the future. |
| <u>Passim</u> | At various points in the proposed accord, certain reporting obligations continue only for the first and second anniversaries of the effective date of the proposed consent decree.  The parties should discuss the basis for choosing to limit temporally the reporting obligations and explain why the reporting obligations were not imposed on an annual basis up to the time the proposed consent decree is terminated. |
| Page 10, ¶ 15 | The second sentence of this paragraph provides that certain "certification reports [at paragraphs 12.a, 13.a, and 14.e] . . . are not subject to review and approval . . . ."  The parties should explain why those reports are excepted. |
| Page 12, ¶ 22 | The final sentence of this paragraph mentions that a certain "certification requirement does not apply to emergency or similar notifications where compliance would be impractical." (Prop. Consent Dec. at 12).  In its present form, the court is unable to ascertain the precise scope of this carve out.  The parties are directed to further elaborate upon their intentions respecting this provision. |

| Page 15, ¶ 31 | It is stated in this paragraph that "The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree." (Prop. Consent Dec. at 15).  The parties should provide to the court the name or position of the individual, or individuals, who are vested with the necessary discretion to accomplish the reduction or waiver. |
|---|---|

In response, the United States filed a 24-page, revised submission, accompanied by the declaration of Mary A. Hunt and Michael Welsh, both of whom serve as Risk Management Program (RMP) Coordinators assigned to the Oil and Prevention Branch of the Hazardous Site Cleanup Division, EPA Region 3, and Paresh R. Pandya, a chemical engineer in EPA Region 3 assigned to the Oil and Prevention Branch of the Hazardous Site Cleanup Division.

Counsel for DuPont was directed to notice an appearance, after which he or she was directed to file forthwith a certificate of authority disclosing that the corporate signatory on the proposed consent decree was duly authorized to bind the corporation on those matters set forth in the accord.  DuPont has complied with both requirements.

Additionally, the parties have filed a joint position statement ("joint submission") respecting the matters set forth in the tabular material <u>supra</u>.  Although the court originally contemplated setting an evidentiary hearing in this matter, the

revised submissions, along with the matters developed during an August 14, 2015, hearing, provide the necessary basis for assessing the fairness, adequacy and reasonableness of the proposed consent decree.

II.

A. The Underlying Conduct

The court incorporates here the discussion found in part I.A of the April 24, 2015, memorandum opinion and order. That earlier discussion is supplemented by new information received by the court in the United States' revised memorandum in support and its exhibits (referred to jointly as "the supplemental materials").

The United States' supplemental materials discuss in greater detail the compliance issues and remediation efforts at the Belle Facility. For example, in February 2010, shortly after the January 2010 release events, EPA inspected the Belle Facility and conducted witness interviews. An immediate enforcement response occurred through the issuance of a unilateral administrative enforcement order ("UAO"). The UAO required substantial corrective measures involved with the

January 2010 release events.  Defendant complied with the UAO and it was terminated on December 11, 2011.  EPA then sought follow-up information from DuPont.

Defendant produced voluminous records and documents in response to the information request.  EPA reviewed the materials to determine if compliance issues contributed to the subject releases.  After finding additional violations, EPA prepared a judicial referral requesting that the Department of Justice ("DOJ") take action to resolve that which EPA found to exist.

In August 2013, DOJ officially notified defendant of the EPA referral and provided an opportunity for settlement discussions.  During several months of discussions, defendant provided additional information concerning the claims alleged.  The parties' settlement negotiations ultimately consumed a year, during which numerous in-person meetings occurred, along with many teleconferences, letters, and email messages in an attempt to arrive at appropriate injunctive relief and a civil penalty.  The United States consulted technical specialists, EPA scientists, and specialists in other federal agencies to discuss the violations and potential remedies.  The parties exchanged multiple drafts concerning proposed injunctive relief and the elements forming the basis for the penalty provision.

III.

Our court of appeals has observed that "a consent decree 'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." Szaller v. American Nat. Red Cross, 293 F.3d 148, 152 (4th Cir. 2002) (quoting Smyth v. Rivero, 282 F.3d 268, 279-80 (4th Cir. 2002)); see also Local No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland, 478 U.S. 501, 519 (1986); United States v. ITT Continental Baking Co., 420 U.S. 223, 237 n.10 (1975) (citation omitted); Alexander v. Britt, 89 F.3d 194, 199 (4th Cir. 1996).

It has expanded upon this principle in Smyth, observing that a court is expected, when presented with a proposed consent decree, to scrutinize the accord and make certain findings prior to entry:

> Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court. As Judge Rubin noted in United States v. Miami,
>
>> Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should. . . examine it carefully to ascertain not only that it is a fair settlement but also

8

> that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.
>
> 664 F.2d at 441 (Rubin, J., concurring). In other words, a court entering a consent decree must examine its terms to ensure they are fair and not unlawful.

Smyth, 282 F.3d at 280.

The standards governing consideration of a proposed consent decree are described further by United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999):

> In considering whether to enter a proposed consent decree, a district court should [1] be guided by the general principle that settlements are encouraged. Nevertheless, a district court should not blindly accept the terms of a proposed settlement. See Flinn v. FMC Corp., 528 F.2d 1169, 1173 (4th Cir.1975). Rather, before entering a consent decree the court must satisfy itself that [2] the agreement "is fair, adequate, and reasonable" and [3] "is not illegal, a product of collusion, or against the public interest." United States v. Colorado, 937 F.2d 505, 509 (10th Cir. 1991). In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case. See Flinn, 528 F.2d at 1172-73. While this assessment does not require the court to conduct "a trial or a rehearsal of the trial," the court must take the necessary steps to ensure that it is able to reach "an informed, just and reasoned decision." Id. (internal quotation marks omitted). In particular, the "court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." Carson v. American Brands, Inc., 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, Circuit Judge, dissenting), adopted by Carson v. American Brands, Inc., 654 F.2d 300, 301 (4th Cir.

9

1981) (en banc)(per curiam).

Id. at 581 (emphasis supplied).

### IV.

In determining whether the proposed consent decree is fair, adequate and reasonable, the court has considered the entirety of the revised submissions.

The court first notes the general principle that settlements are encouraged. That is particularly the case here, where the proposed consent decree is sponsored by the environmental regulator authorized by Congress to enforce the federal laws allegedly violated. Indeed, the court has previously observed as follows:

> The EPA and DEP are governmental agencies that employ individuals specially trained and familiar with the relevant scientific disciplines and governing law. The decision to avoid what might well have been a costly and time-consuming diversion of limited agency resources appears to have been a reasonable one under the circumstances.

United States v. Patriot Coal Corp., No. 2:09-0099, 2009 WL 1210622, at *5 (S.D. W. Va. Apr. 30, 2009). Settlement also avoids the pretrial and trial events that would otherwise have consumed a significant amount of time and expense by the

10

parties, including the public fisc, along with a substantial redirection of judicial resources.

Second, the proposed consent decree is entirely legal. That document and the efforts that preceded it appear to be a substantial undertaking. The court originally harbored misgivings respecting the proposed civil penalty and the defendant's continuing compliance obligations in the event of a sale or transfer of the Belle Facility. Those concerns have been substantially resolved.

Respecting the proposed penalty, the court has now learned through the Pandya and Hunt declarations that the penalty amount exceeds the economic benefit calculated by EPA for the violations at issue. The methodology for the calculation is also discussed at length. The amount was agreed upon after weighing the economic benefit, the extent and environmental impact of the alleged violations, the penalties assessed in similar settlements, consideration of the statutory penalty factors, and the United States' assessment of the litigation risk associated with its claims. Aside from those considerations, the court has now learned that defendant has or will expend at least $9,105,000 to comply with the injunctive

relief in complying with the UAO and the proposed consent decree.

Respecting the question of defendant's continuing obligations under the proposed consent decree, the parties have clarified that DuPont remains responsible for compliance irrespective of any transfer or sale of the Belle Facility. Specifically, following the August 14, 2015, hearing wherein the court continued to express concerns about the matter, counsel for DuPont filed a notice pleading on September 11, 2015, attaching as Exhibit 1 a document executed by Chemours and DuPont entitled "First Amendment to Environmental Compliance Agreement" which Agreement is referred to therein as the "Consent Decree Agreement."  DuPont additionally placed of record on that date the same parties' "Environmental Compliance Agreement."  The Environmental Compliance Agreement and the First Amendment to Environmental Compliance Agreement are, with the parties' earlier expressed consents via email, attached to the proposed consent decree and incorporated in their entirety therein.  The "First Amendment to Environmental Compliance Agreement" provides pertinently as follows:

> WHEREAS, on January 28, 2015, DuPont and Chemours . . . executed the Consent Decree Agreement, pursuant to which Chemours acknowledged the applicability of

**the Consent Decree, and accepted legal responsibility for satisfaction of all provisions of the Consent Decree; . . . .**

 **. . . .**

 **WHEREAS, on June 1, 2015, Chemours sold to Optima Belle, LLC ("Optima") certain process units at the Belle Plant that are subject to the Consent Decree . . . ;**

 **WHEREAS, pursuant to an agreement executed between Chemours and Optima, dated March 2015 and titled "Agreement Governing Satisfaction of EPA Consent Decree" (the "Optima Agreement"), Chemours retained responsibility for satisfying all obligations of the Consent Decree subsequent to the transfer of the Optima Processes from Chemours to Optima;**

 **WHEREAS, the Optima Agreement preserves to Chemours all legal rights necessary for Chemours to satisfy the obligations of the Consent Decree, including a legal right of access to all Optima Processes;**

 **. . . .**

 **NOW, THEREFORE, . . . the Parties agree to clarify the Consent Decree Agreement through this First Amendment as follows:**

 **. . . .**

**1. All provisions of the Consent Decree Agreement remain in fi1ll force and effect, except to the extent modified by this First Amendment.**

**2. Paragraph 2 of the Consent Decree Agreement is replaced with the following paragraph:**

   **2. Chemours further acknowledges that Chemours shall take legal possession of the Belle Plant Processes subject to the rights and obligations set forth in the Consent Decree. DuPont and**

13

>    Chemours expressly recognize that neither the
>    transfer of the Belle Processes to Chemours nor
>    execution of this Agreement has the effect of
>    modifying in any way the obligations imposed
>    under the Consent Decree.
>
> 3. Paragraph 5 of the Consent Decree Agreement is
> replaced with the following paragraph:
>
>    5. Chemours shall accept responsibility for
>    satisfaction of all provisions of the Consent
>    Decree after the Effective Date. Because DuPont,
>    as a named party to the Consent Decree, remains
>    responsible to the United States, through the
>    EPA, for ensuring the satisfaction of the
>    provisions of the Consent Decree, Chemours
>    further commits that, for the full period during
>    which DuPont is subject to the Consent Decree,
>    in the event that Chemours defaults on its
>    obligations hereunder to satisfy all provisions
>    of the Consent Decree:
>
>       a. Chemours shall take such actions as may
>       be necessary to ensure that DuPont shall
>       have such legal right of access to the
>       Belle Plant Processes necessary for DuPont
>       to satisfy any remaining obligations under
>       the Consent Decree; and
>
>       b. Chemours shall promptly provide to
>       DuPont all information reasonably
>       requested by DuPont for DuPont to satisfy
>       any remaining reporting and certification
>       requirements under the Consent Decree.
>
>    Chemours' obligations under this paragraph shall
>    remain in full force and effect notwithstanding the
>    transfer of any legal interest in the Belle Plant
>    Processes to any third party, including but not
>    limited to Optima.

(First Am. at 3-6).  These provisions are understood to require

DuPont to fulfill its obligations under the proposed consent

decree irrespective of any transfer of ownership in the facility and to permit DuPont access to the facility and its records for that purpose.

Respecting the strength of the United States' case, the extent of discovery that has taken place, the stage of the proceedings, and the experience of counsel who negotiated the settlement, the court now has necessary information from the declarations. In sum, the United States and counsel for defendant engaged in months of arm's length negotiations and had the opportunity to explore each other's positions at length. Negotiations were conducted by qualified counsel for each party, who relied on engineers, from both EPA and defendant, with technical knowledge to develop opinions on appropriate relief. All told, the proposed consent decree is the product of several years of investigations and nearly a year of negotiations.

As noted, the parties were additionally directed to address the following matters. The summarized responses are found in the third column below:

| Citation | Matter Raised | Parties' Response |
|---|---|---|
| Page 3, ¶ 4 | This provision should also require any successor, assignee, parent, subsidiary, or like transferee, | The transferee is not required to expressly assume the obligations to implement injunctive |

15

| | | |
|---|---|---|
| | subsequently exercising authority and control over the Belle Facility, to expressly assume in writing all of the obligations imposed by the proposed consent decree, with such written agreement to be delivered to the EPA at least 30 days prior to any such transfer. | relief under the proposed consent decree because those obligations will continue to be binding upon the defendant regardless of transfer. |
| Page 6, ¶ 11 | The first sentence of this paragraph states: "As of June 2011, Defendant has and will continue to <u>permanently cease</u> operations of the SAR Unit and the Phosgenation Process at the Facility." (Prop. Consent Dec. at 6 (emphasis added)). The second sentence of this paragraph states that DuPont "<u>has no plan</u> to resume operations of the SAR Unit or the Phosgenation Process at the Facility." (<u>Id.</u> (emphasis added)). It is thus unclear if DuPont will permanently discontinue these two production components. Additionally, the parties should advise what procedures will be necessary if either the SAR Unit or the Phosgenation Process is proposed for reignition in the future. | The parties have clarified that the SAR Unit and the Phosgenation Process are permanently discontinued. |
| <u>Passim</u> | At various points in the proposed accord, certain reporting | The parties have adequately explained the matter at pages 6 |

16

| | | |
|---|---|---|
| | obligations continue only for the first and second anniversaries of the effective date of the proposed consent decree. The parties should discuss the basis for choosing to limit temporally the reporting obligations and explain why the reporting obligations were not imposed on an annual basis up to the time the proposed consent decree is terminated. | through 8 of their joint submission. |
| Page 10, ¶ 15 | The second sentence of this paragraph provides that certain "certification reports [at paragraphs 12.a, 13.a, and 14.e] . . . are not subject to review and approval . . . ." The parties should explain why those reports are excepted. | At page eight of the joint submission, the parties state as follows: "In negotiations, the parties agreed it was not necessary to require EPA review and approval of DuPont's report certifying that its SOPs remain current, accurate and are being implemented. DuPont has a separate legal obligation to ensure that its SOPs are current and accurate under 40 C.F.R. Part 68, Section 68.69(c), which continues beyond the obligations of this proposed Consent Decree." Id. |
| Page 12, ¶ 22 | The final sentence of this paragraph mentions that a certain "certification | At page nine of the joint submission, it is stated as follows: "[T]he United States |

17

|  | requirement does not apply to emergency or similar notifications where compliance would be impractical." (Prop. Consent Dec. at 12). In its present form, the court is unable to ascertain the precise scope of this carve out. The parties are directed to further elaborate upon their intentions respecting this provision. | includes the language . . . so that should an emergency occur requiring immediate notice to the United States, the Defendant is not required to follow the formality of obtaining a certification (and the attendant delay) before providing the notice."  (Id.) |
|---|---|---|
| Page 15, ¶ 31 | It is stated in this paragraph that "The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree." (Prop. Consent Dec. at 15). The parties should provide to the court the name or position of the individual, or individuals, who are vested with the necessary discretion to accomplish the reduction or waiver. | At page ten of the joint submission, it is stated as follows: "For EPA, the Regional Administrator has authority to reduce or waive stipulated penalties. Again, depending on the stipulated penalty amount, for the Department of Justice, the Deputy Chief of the Environmental Enforcement Section and the Assistant Attorney General for the Environment and Natural Resources Division would have the authority to waive or reduce stipulated penalties." (Id.) |

Having taken account of all of the applicable factors, it is apparent that the United States has fairly, reasonably,

and adequately obtained compliance without the cost, delay, and misdirection of resources that might have otherwise happened during time-consuming civil litigation. The court, accordingly, finds that the proposed consent decree is fair, adequate, and reasonable. The court further finds the accord is neither illegal nor the product of collusion and that it serves the public interest. In view of these findings, and inasmuch as no person has opposed entry of the proposed consent decree, the court ORDERS as follows:

1. That the United States' unopposed motion to enter the proposed consent decree be, and it hereby is, granted;

2. That the proposed consent decree be, and hereby is, entered with the court's approval this same date; and

3. That this action be, and it hereby is, dismissed and stricken from the docket, with the court retaining jurisdiction pursuant to Article XVII of the consent decree.

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

DATED: September 25, 2015

_____
John T. Copenhaver, Jr.
United States District Judge